THE N. C. RAILROAD COMPANY v. GEORGE W. SWEPSON
and others.

A committee of three persons, appointed by the plaintiff Commissioners
of a Sinking Fund, authorized by law, and empowered to exchange N.
C. bonds, known as "old sixes," for those known as "new sixes,"
must, in effecting such exchange, *all act together ;* and any attempted
exchange made by one or two of such committee without consultation
with, and concurrence of the other members thereof, is utterly void,
and in no ways binding on the plaintiff.

This was a CIVIL ACTION, being an original bill filed in the
Court of Equity for WAKE county, to set aside a certain ex-
change of bonds made by defendants and for an account, heard
before his Honor, *Judge Tourgee,* at the Special (January)
Term, 1874, of the Superior Court of said county, upon an
agreed state of facts.

On the trial below, his Honor gave judgment dismissing the
bill; from which judgment plaintiff appealed.

All the facts are fully set out in the opinion of the Court.

*Moore & Gatling,* for appellant.
*Fuller & Ashe,* contra.

READE, J. The plaintiff had a sinking fund, and a com-
mittee of three, viz: the defendants Mendenhall, Davis and
Flanner, to manage it. A part of this sinking fund was
$100,000 in North Carolina bonds known as "old sixes." At
a meeting of the plaintiff's Board of Directors in July, 1863,
a resolution was adopted that the said committee be authorized
" to convert the old sixes North Carolina bonds into new sixes
as occasion may offer."

1. Prior to December, 1864, the committee had disposed of
all the " old sixes " satisfactorily to the plaintiff, except $33,000.
Of that sum the plaintiff alleges that $10,000 has never been
accounted for by the committee in any way; $23,000 remained

in the hands of the committee, Davis being the custodian. On the 5th of December, 1864, defendant Swepson applied to Davis to allow him to take the said balance of " old sixes," $23,000, on the terms of his giving two " new sixes " for one old, and allowing him time to comply with the terms. Davis, who lived in Salisbury, replied by letter that he would accede to the proposition if Mendenhall would, who lived in Greensboro,' and that is the last that Davis heard of it. Mendenhall did agree to it with Swepson, " but took no proceedings actually to carry out the exchange." And there the matter rested. On the 12th of January, 1865, plaintiff's Board of Directors passed a resolution directing the committee to exchange no more " old sixes " unless for its own 8 per cent. bonds, and this notice was immediately served upon the members of the committee. Davis immediately, 16th of January, 1865, wrote to Swepson informing him of the order of the Board. After which Davis never heard more of the exchange; considered his authority to make the exchange at an end, and did not know that any exchange had been made until it was all over. Swepson made no reply to Davis' letter informing him of the order of the Board of the 12th of January, 1865, but went to Mendenhall and insisted that the contract should be carried out, notwithstanding the January order. Mendenhall declined, and insisted upon writing and laying the matter before the Board at its next meeting. Of all this Davis knew nothing, and Flanner, the other member of the committee, had never been consulted at all, until about the 8th of April, 1865, when happening to be in Greensboro', Swepson saw him and told him the state of things, and he told Swepson that if the contract had been made before the 12th of January order, he thought it ought to be carried out in good faith, and he went with Swepson to Mendenhall and said the same. But he did not then consider himself as acting as committee-man, as he had never been consulted or had anything to do with the contract, and he would have then given different advice if he had known that Swepson was not prepared to comply with the con-

tract, as it seems he was not. About the last of April or first of May, 1865, and only a short time before the Board were to meet in July, Swepson and Mendenhall effected a sham exchange, by Mendenhall's delivering over to Swepson the "old sixes" and Swepson delivering over to him "new sixes," which were not his, but were borrowed for the purpose and were to be returned to the owners in kind, and which were subsequently re-delivered by Mendenhall to Swepson in exchange for others which Swepson had bought up at three cents in the dollar. As before stated, Davis had been the custodian of the fund and of these old sixes, and had sent them to Mendenhall for safe keeping upon the approach of the Federal army, and he did not know of the disposition of the "old sixes" by Mendenhall until the funds were returned to him, when he found the old sixes gone and the new ones in their place.

The excuse given for this transaction between Mendenhall and Swepson is, that the contract was made in December, 1864, before the order of the Board forbidding it, 12th of January, 1865, and that *good faith* required that it should be carried out. Davis, to whom Swepson made the first proposition to make the contract and who knew the terms proposed by Swepson, and what he had done on his part, did not think so, but thought the whole matter ended. Flanner had not been consulted in making the contract, and although he subsequently said to Swepson and Mendenhall that he thought it ought to be carried out, yet if he had known the truth about it he would have advised differently. Mendenhall himself at first declined to carry it out without consulting the Board. How is it that Mendenhall never consulted either of his co-committeemen, especially as Davis made the contract and was the custodian of the bonds? And if Mendenhall had determined to make the exchange, where was the propriety of the unreasonable indulgence given Swepson to comply on his part? Swepson had some time before this transaction, made a like proposition for $25,000 of the "old sixes" and asked time to comply, and the terms were accepted and the exchange was made in a short

time thereafter.   But here the contract was made 5th of De-
cember, 1864, and Swepson had made no proposition to com-
ply 12th of January, 1865, and never was ready to comply
until May or June, 1865, six months after the contract.   It is
true, Swepson had before that demanded of Mendenhall a com-
pliance, but he was not himself prepared to comply.   And if
Mendenhall had intended to comply at any time, how easy it
would have been for him to say, well, I am ready.   And then
Swepson being not ready, the matter would have ended.   But
he is indulged for six months, a part of the time under the
plea by Mendenhall that he wanted to consult the Board, which
was to meet in July.   And then just before July the matter is
hurried up as if to forestall the Board in July.   And thus the
valuable effects of the plaintiff were exchanged for "trash"
under the plea that good faith to Swepson required it.

And yet, if good faith had required that the contract should
be observed, and that Swepson should be indulged it would
have been no bad faith in Mendenhall not to observe it; for it
was not *his* contract.   He was but an agent, and was dealt with
as an agent, and the contract was the contract of his principal,
the plaintiff.   And, for a breach of it, he was not liable legally
or moraly.   If there was a breach of it by the order of 12th
January, 1865, or in any other way, the plaintiff was liable in
damages.   But that order put an end to Mendenhall's agency
in that matter.   It forbid him to make the exchange; and
"good faith" in Mendenhall required him to obey his principal.
It is said, that the refusal of the plaintiff to complete the con-
tract was an afterthought, induced by the repudiation of the
new sixes by the State Convention under Federal influence.
That cannot be so, because the war had not then ended, and
the Convention did not meet until the Fall succeeding; but if it
were true, still the bad faith of the plaintiff did not give the
agent power to act.   But, put the case in the most favorable
light, the agent made the contract 5th December, 1864, when
"new sixes" were of considerable value; Swepson says in his an-
swer that many business men thought them perfectly good,.

23

and suffered it to lie loose until May or June, and then suffered it to be performed by Swepson by the delivery of new sixes, when they had been depreciating all the time and were reduced to the market value of three cents in the dollar. In passing upon the liability of fiduciaries for transactions during the war, we have found that justice required a very liberal rule in their favor; but there has been no case where we have felt at liberty to sustain an agent in such negligence as this, even where no fraud was imputed ; and we do not say that moral turpitude is apparent here.

But there is another view which is decisive against the defendants. As has been said, the plaintiff's board appointed a committee of three to act in the premises. It was necessary that they should *all act together.* The act of one without the others was utterly void. It is so laid down in Co. Litt 181, b ; Bacon Ab. Authority C.; Com. Dig Atty. C. 11, and by all the writers since Coke down to Story on Agency, sec. 42. "In regard to two or more agents : It is a general rule of the common law that where an authority is given to two or more persons to do an act, the act is valid to bind the principal, only when all of them concur in doing it ; for the authority is construed strictly, and the power is understood to be joint and not several. * * * So if an authority is given to two persons jointly to sell the property of the principal, one of them separately cannot execute the authority." The same is laid down in *State* v. *Lane*, 4 Ired., 431. A different rule prevails in public agencies where a majority may act. Id.

It is not necessary that we should consider the question whether when there are two or more agents to do an act, there ought not to be not only concurrence, but consultation ; because here the three agents never did concur. Davis, to whom Swepson first applied to make the contract, said he was willing if Mendenhall would consent. Mendenhall did consent, but his consent was never communicated to Davis. Take it, however, that this was a concurrence on the part of *two* of the agents; yet Flanner had not even been notified up to 12th

January, 1865.  And then Davis considering his authority at an end withdrew it and notified Swepson.  So that Mendenhall then stood alone.  It is true Flanner was subsequently informed of the contract by Swepson and expressed the opinion that if the contract had been made before the authority was revoked it ought to be complied with ; but he says that he did not say that as a committee-man, as he had nothing to do with the contract, and he would have expressed a different opinion if he had known that Swepson was not prepared to comply with the contract on his part.

It is clear that there never was any valid contract to bind the plaintiff for the sale or exchange of the $23,000 " old sixes ;" and that Swepson is liable for the value of the same with interest from the time of their conversion.  And as Mendenhall delivered them over to Swepson after his authority to do so had been revoked, he is liable to the plaintiff also if Swepson should fail.  Davis seems not to be liable on this transaction.  The facts are not sufficiently explicit to enable us to determine as to Flanner's liability.

The plaintiff is entitled also to an account for the $10,000 which it is alleged the Committee have not accounted for.  If they were disposed of prior to January 12th, 1866, under the authority which they had and accounted for the proceeds to the plaintiff, they are not liable, otherwise they are.

There is error in the order dismissing the bill.  This will be certified, and the cause remanded to be proceeded with according to law.

PER CURIAM.                    Judgment accordingly.